# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 17-1355V

Filed:  December 17, 2021

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | | |
| HERBERT GELLER, | * | UNPUBLISHED |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | Ruling Awarding Damages; |
| | * | Pain and Suffering; |
| | * | Influenza ("Flu") Vaccine; |
| SECRETARY OF HEALTH | * | Brachial Neuritis. |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| | * | |
| * * * * * * * * * * * * * * | | |

*Leah Durant, Esq.*, Law Offices of Leah V. Durant, PLLC, Washington, DC, for petitioner.
*Claudia Gangi, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

## RULING AWARDING DAMAGES[1]

**Roth**, Special Master:

On September 27, 2017, Herbert Geller ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("the Program")[2] alleging that he received an influenza ("flu") vaccination on September 22, 2015, and thereafter suffered from brachial neuritis. *See* Petition ("Pet.") at 1.

---

[1] Although this Decision has been formally designated "unpublished," it will nevertheless be posted on the Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). **This means the Decision will be available to anyone with access to the internet.** However, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public. *Id*.

[2] The Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-10 et seq. (hereinafter "Vaccine Act" or "the Act"). Hereafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

1

For the reasons set forth below, I find that $125,000.00 represents a fair and appropriate amount of compensation for petitioner's past pain and suffering and $2,500.00 per year, reduced to net present value, for the remainder of his life expectancy for future pain and suffering.

## I. Procedural History

The petition was filed on September 27, 2017. ECF No. 1. Petitioner filed medical records, an affidavit, and a Statement of Completion on November 24, 2017. Petitioner's Exhibits ("Pet. Ex.") 1-7, ECF No. 7; Statement of Completion, ECF No. 8.

Respondent filed his Rule 4(c) Report on July 11, 2018, recommending against compensation in this matter. ECF No. 14.

A status conference was held on August 14, 2018, after which petitioner was ordered to file an expert report. Scheduling Order, ECF No. 15.

Petitioner filed an expert report and CV from Dr. Ahmet Hoke on December 7, 2018. Pet. Ex. 8-9, ECF No. 16. Respondent was ordered to file either an expert report or a status report indicating how he intended to proceed. Non-PDF Order, issued Dec. 10, 2018.

Following several motions for extension of time, respondent filed an Amended Rule 4(c) Report ("Am. Rpt.") on May 28, 2019, stating that, in light of Dr. Hoke's report, respondent would not contest entitlement to compensation. *See* Motion for Extension of Time ("MFET"), ECF No. 17; Non-PDF Order, issued Feb. 6, 2019; MFET, ECF No. 18; Non-PDF Order, issued May 7, 2019; MFET, ECF No. 19; Non-PDF Order, issued May 23, 2019; Am. Rpt., ECF No. 20. Respondent requested that petitioner submit proof of the type, level, and cost of care provided to petitioner for his brachial neuritis; any insurance policies which may cover petitioner's treatment; any local, state, or federal services or aid provided to petitioner (including but not limited to Medicaid coverage), and the amount of such services or aid; and any other information, entitlement, or fact that would aid the respondent and the court is assessing petitioner's damages and/or needs. Am. Rpt. at 8.

On May 29, 2019, a ruling on entitlement was issued finding petitioner entitled to compensation. ECF No. 21. A damages order was issued later that day. ECF No. 22.

The parties discussed damages for several months, during which time petitioner submitted a letter from Dr. Hoke. *See* Petitioner's Status Report ("Pet. S.R."), ECF No. 24; Non-PDF Order, issued July 29, 2019; Respondent's Status Report ("Resp. S.R."), ECF No. 25; Non-PDF Order, issued Sept. 12, 2019; Pet. S.R., ECF No. 26; Non-PDF Order, issued Oct. 16, 2019; Pet. Ex. 10, ECF No. 27; Pet. Joint S.R., ECF No. 28; Non-PDF Order, issued Nov. 15, 2019.

The parties advised via joint status report on December 16, 2019, that "the Special Master will need to determine an appropriate award for pain and suffering this case." Pet. Joint S.R. at 1, ECF No. 29. The parties agreed that damages could be resolved on briefs and proposed a briefing schedule. *Id*. Petitioner was ordered to file a Motion for a Damages Decision on the Record by January 30, 2020.

On January 30, 2020, petitioner filed a Motion for a Damages Ruling on the Record. ECF No. 31. ("Pet. Motion") Petitioner also filed a supplemental affidavit. Pet. Ex. 11, ECF No. 30. Respondent filed a response on March 30, 2020. ECF No. 33. Petitioner filed a reply on May 11, 2020.

This matter is now ripe for decision.

## II. Factual History

Petitioner received a flu shot in his nondominant left arm, as recommended, on September 22, 2015 at a clinic at the NIH, where he worked as a scientist. Pet. at ¶ 1; Pet. Ex. 1 at 1; Pet. Ex. 7 at ¶ 1. Up until 2015, petitioner had received a flu shot in his left arm every year since arriving at the NIH in 2001. Pet. Ex. 7 at ¶ 1. At the time he received the September 2015 flu shot, his medical history included high blood pressure, high cholesterol, hypothyroidism, right retinal artery occlusion, left knee pain, left ankle pitting edema, cervical spine stenosis, and degenerative disc disease. Pet. at ¶ 1; Pet. Ex. 2 at 2, 5, 13, 16, 50-53; Pet. Ex. 4 at 12, 17, 22. Specifically, in 2012, prior to receipt of his vaccination, petitioner received care for left arm, shoulder, and lower back pain from Dr. Spiegel on several occasions. Pet. Ex. 2 at 19, 35, 37

According to his affidavit, petitioner "woke up with a severe pain in [his] left shoulder and arm" two days after receiving the flu shot. Pet. Ex. 7 at ¶ 2. He initially attributed the pain to muscle strain and tried taking ibuprofen; when the pain did not abate, he made an appointment to see Dr. Spiegel. *Id*.

On October 7, 2015, petitioner presented to Dr. Spiegel, an osteopath, for "severe pain in the left shoulder – onset two days ago." Pet. at ¶ 2; Pet. Ex. 2 at 111. He was in so much pain that his wife had to drive him to the appointment. Pet. Ex. 7 at ¶ 2. Petitioner had tried using a heating pad but the "pain has progressed to the point where [he] is unable to stand or sit for long periods of time as the pain will escalate." Pet. at ¶ 2; Pet. Ex. 2 at 111. The pain was "localized to the back of the shoulder in the region of the scapula," and there was "no pain with movement of the shoulder." Pet. at ¶ 2; Pet. Ex. 2 at 111. "The pain did not change or become aggravated when Dr. Geller moved his head[,] and lying flat seemed to partially relieve the pain to the point where it was tolerable." Pet. at ¶ 2. Petitioner had 5/5 strength in all major muscle groups. Pet. Ex. 2 at 112. Dr. Spiegel diagnosed "spinal stenosis, cervical region" and "cervical disc disorder w[ith] radiculopathy, mid cervical region", and prescribed a Medrol Dosepak and Flexeril, a muscle relaxant. Pet. at ¶ 2; Pet. Ex. 2 at 112.

For the next two weeks, petitioner was in such intense pain that he "was not able to travel to work" and had to work from home, "largely in a supine position." Pet. Ex. 7 at ¶ 3. "As the pain began to subside, [his] left hand became incredibly weak." *Id*. He "could not move the fingers on [his] left hand and was forced to type only with [his] right hand." *Id*. He also "could not button up [his] trousers or shirt, grasp a bath towel with [his] left hand, cut meat with a knife and fork, or tie [his] shoelaces." *Id*. He "could not turn doorknobs with [his] left hand, use a zipper on [his] jacket or a nail clipper with [his] left hand." *Id*. His "left hand lost strength in cold weather" and he had to learn how to use a snow shovel mainly with his right hand. *Id*.

3

On October 15, 2015, petitioner returned to Dr. Spiegel; he reported "at best a small improvement as he is now able to sit up with less discomfort" but was still symptomatic. Pet. at ¶ 3; Pet. Ex. 2 at 109. Dr. Spiegel "felt that the treatment options were using a higher dose of steroids for a longer period of time, an epidural block, and/or surgical decompression." Pet. at ¶ 3. Petitioner advised that he "would like to be as conservative as possible" but he could get access to a neurosurgeon quickly if needed. Pet. at ¶ 3; Pet. Ex. 2 at 109. Dr. Spiegel prescribed oxycodone for pain and a higher dose of prednisone. Pet. Ex. 2 at 110. "Dr. Spiegel recommended Dr. Geller wait until the pain level decreased before starting PT[] and told Dr. Geller he would have to stay home until his ability to sit improved." Pet. at ¶ 3.

Petitioner returned to Dr. Spiegel on October 21, 2015 for a follow-up; he reported that he had noticed an 85% reduction in pain after taking the higher steroid dose. Pet. at ¶ 4; Pet. Ex. 2 at 107. He had "just started the tapering of the steroid from the high of 50 mgs." Pet. at ¶ 4; Pet. Ex. 2 at 107. Petitioner was sleeping well and was able to sit without difficulty such that he "has been able to return to work as of Monday [October 19, 2015]." Pet. at ¶ 4; Pet. Ex. 2 at 107. On exam, Dr. Spiegel noted persistent weakness in the distribution of the lower trunk of the plexus. Pet. at ¶ 4; Pet. Ex. 2 at 108. "Dr. Spiegel suggested that Dr. Geller start hand PT to help with strengthening exercises, continue the slow prednisone taper, and return when he was off the steroids." Pet. at ¶ 4.

On November 11, 2015, petitioner had a physical therapy evaluation at Summit Orthopedics for pain and weakness of the left upper extremity. Pet. at ¶ 5; Pet. Ex. 3 at 5, 6. Petitioner had "slow progression of exercises" and "some diff[iculty] holding w[eigh]t for biceps curls due to [problems with his] grip." Pet. at ¶ 5; Pet. Ex. 3 at 5. Petitioner attended five PT sessions between November 11 and December 9, 2015. Pet. at ¶ 6; Pet. Ex. 3 at 1. Per his treater, petitioner "did not demonstrate significant progress," and he chose to continue with a home exercise program rather than attending additional therapy sessions. Pet. Ex. 3 at 1.

Petitioner also saw Dr. Spiegel on November 11, 2015; he reported that he had completed his second course of steroids, "however, there is still residual pain and weakness of the left hand." Pet. at ¶ 7; Pet. Ex. 2 at 105. He rated his pain level at 1-2/10 with use of Tylenol and Motrin. Pet. Ex. 2 at 105.

Petitioner "self-referred himself to the Peripheral Nerve Clinic for evaluation of left arm pain and weakness." Pet. at ¶ 8; Pet. Ex. 5 at 1. On November 12, 2015, petitioner presented to Dr. Hoke at the Johns Hopkins Hospital Peripheral Nerve Clinic, who confirmed the diagnosis of brachial plexus inflammation. Pet. at ¶ 8; Pet. Ex. 5 at 1; Pet. Ex. 7 at ¶ 4. Petitioner reported that "after the initial pain and weakness, he noted that the pain started to get better; however, weakness has persisted all along and he is not sure if there is any improvement." Pet. at ¶ 8; Pet. Ex. 5 at 1. Petitioner had no noticeable atrophy in the upper extremities, but he had weakness on the left as compared to the right in several muscles including the arm abductors, elbow flexors, internal and external rotators, wrist extensors and flexors, and finger flexors and extensors. Pet. at ¶ 8; Pet. Ex. 5 at 1. He had 4- to 4+/5 strength of the left side and 5/5 strength on the right side. Pet. at ¶ 8; Pet. Ex. 5 at 1. Tinel tests at the left wrist and elbow were positive for irritated nerves. Pet. at ¶ 8; Pet. Ex. 5 at 2. Dr. Hoke noted that petitioner did not have any significant sensory deficits or symptoms but did have "evidence of perhaps unrelated multiple entrapment

neuropathies at the median and ulnar nerves as well as weakness in his right arm, perhaps due to his known C-spine disease." Pet. at ¶ 8; Pet. Ex. 5 at 2. Dr. Hoke expected petitioner "to recover slowly over the next couple months" and prescribed gabapentin for symptomatic control of neuropathic pain. Pet. at ¶ 8; Pet. Ex. 5 at 3.

On February 22, 2016, petitioner returned to Dr. Hoke for follow-up. "Dr. Hoke indicated that when he first saw Dr. Geller, Dr. Geller 'had already reached a nadir and his clinical course since then has been a very slow improvement.'" Pet. at ¶ 10; Pet. Ex. 5 at 4. Petitioner could "pick up and carry his briefcase, but still had trouble with fine motor tasks involving his left hand. He was able to type though." Pet. at ¶ 10; Pet. Ex. 5 at 4. Petitioner had been using wrist braces to prevent any further progression of his "significant entrapment neuropathies." Pet. at ¶ 10; Pet. Ex. 5 at 4. Petitioner had increased his exercise regimen but had not been doing any significant resistance training. Pet. Ex. 5 at 4. He had mild improvement on exam. *Id*. "Dr. Hoke told Dr. Geller that he was 'doing well with expected slow recovery from brachial neuritis. Unfortunately, he probably has sustained some secondary axonal injury' and that meant 'that some of the most distal hand functions may not fully recover.'" Pet. at ¶ 10; Pet. Ex. 5 at 4. Dr. Hoke told petitioner "that most of the improvement is seen within the first 6-9 months, and I expect him to continue to show slow improvement." Pet. at ¶ 10; Pet. Ex. 5 at 4.

Petitioner saw Dr. Spiegel for right thigh pain on July 7, 2016; it was noted that petitioner's "hand [was] mostly recovered . . . with difficulty with fine motor tasks such as buttoning and manipulating small items." Pet. Ex. 2 at 102. Petitioner continued to seek regular follow-up care for right hip and thigh pain over the next six months. *See id*. at 84, 86, 88, 90, 92, 94, 96, 98. At a follow-up visit on December 27, 2016, petitioner was noted to have "residual weakness in the left hand from brachial amyotrophy." *Id*. at 82.

As of March 6, 2017, petitioner presented to Dr. Spiegel for management of chronic conditions, including cervical stenosis, cervical disc disorder, and cervical and lumbar region radiculopathy. Pet. Ex. 2 at 155-56. Petitioner reported that he was running more than in the recent past and was able to do so without pain. *Id*. at 76, 155. Petitioner returned on March 31, 2017; it was noted that his left-hand weakness was stable with no improvement or worsening of function. *Id*. at 157.

Petitioner presented to his cardiologist on April 17, 2017 for a follow-up visit. Pet. Ex. 4 at 3. He was "being managed for left brachial plexus inflammation thru [n]eurology group at Hopkins." *Id*. Petitioner was "feeling well. The neurologic issue does not limit him in any way." *Id*. He reported exercise including "running, biking and skiing" and that "overall he is feeling very well." *Id*. Petitioner's neurologic and musculoskeletal assessments were normal. *Id*. at 5.

Petitioner returned to Dr. Spiegel on April 28, 2017 for intermittent pain in the right lateral hip and thigh region; he was still running two to three times per week and it did not appear to make the pain worse. Pet. Ex. 2 at 159. Petitioner returned on May 26, 2017; he reported occasional pain in the right thigh that was not disabling or severe enough for him to take any medication. *Id*. at 161. He was running four miles at a time without much pain. *Id*.

5

In May 2017, petitioner had gained enough strength to use a nail clipper in his left hand by forming a fist, rather than using his fingers. Pet. Ex. 7 at ¶ 5. He could also button the top button of a shirt. *Id*.

By summer 2017, he was able to hold the main sheet of a sailboat, though tying shoelaces was still difficult. Pet. Ex. 7 at ¶ 5. He cannot open jars or soda bottles by holding the bottle in one hand and twisting the lid in the other. *Id*. He continues to have ongoing pain, weakness, and dysfunction of his left arm, shoulder, and hand to this day. *Id*.

On July 21, 2017, petitioner presented to Dr. Spiegel after a fall while running; he tripped on a tree root and had pain in his chest wall and upper back. Pet. Ex. 2 at 165. He did not have difficulty breathing, so he did not go to the ER. *Id*. He still had obvious weakness in the left hand. *Id*. Dr. Spiegel recommended rest, stretching, and a custom AFO for his right leg. *Id*. at 166.

Petitioner still has "substantial deficits" from his brachial neuritis. Pet. Ex. 11 at ¶ 1. The muscles in his left hand have atrophied, resulting in "three major deficits: 1) loss of strength, 2) loss of fine control of finger and hand movement and 3) loss of fine motor coordination." *Id*. at ¶ 2. Furthermore, petitioner still cannot oppose his thumb and little finger. *Id*. at ¶ 3. This has "significantly impeded" certain work activities requiring fine motor control; for example, he cannot obtain brain tissue from neonatal activities or use a pipette with his left hand. *Id*. At home, he cannot perform minor household repairs, open a tight jar lid or zip-loc bag, or pick vegetables or weeds with his left hand. *Id*. at ¶ 4. He "occasionally experiences pain in the affected areas." *Id*. "Periodically, especially during colder weather, [his] left hand will freeze while holding a utensil, which has interfered with [his] ability to cut items on a plate into bite-sized pieces." *Id*. at ¶ 5.

Notably, petitioner also has evidence of unrelated multiple entrapment neuropathies at the median and ulnar nerves for which he wears wrist guards as well as weakness in his right arm, perhaps due to his known C-spine disease. Pet. at ¶ 8; Pet. Ex. 5 at 2. Thus, not all his deficits are the result of his vaccine related injury.

### III. Parties' Arguments

#### A. Petitioner's Argument

Petitioner demands $225,000.00 in past pain and suffering and $5,000.00 per year in future pain and suffering "for the remainder of his life (statistically 12 more years)." Pet. Motion at 9, 11.

Petitioner submits that, under the *McAllister/Graves* factors, he is "entitled to a very large award for both past and future pain and suffering." Motion at 14. First, he is "acutely aware of the pain and hand weakness." *Id*. Second, petitioner's "pain was initially severe but admittedly lessened," but "he continues to experience pain to this very day" and sustained axonal damage that keeps him from opposing his thumb. *Id*. Third, "petitioner's injury is permanent and will continue to plague him for the rest of his life." *Id*.

Petitioner submits that the Vaccine Act is a "broad remedial statute" intended to make awards "quickly, easily, and with certainty and generosity." Motion at 15. Because the statutory cap of $250,000 "would be worth exponentially more than that in today's economic environment" once adjusted for inflation and considering "the Act's history of promoting generous compensation," petitioner submits that "the Special Master should make a very high pain and suffering award in this case." *Id*. at 14. For example, respondent's suggested award of $120,000, if made in 1988, would be worth $261,824.18 in 2020; conversely, an award of $120,000 today would be equivalent to $54,998.74 in 1988. Reply at 6. Petitioner submits that "Congress intended awards for pain and suffering over time to be adjusted for inflation, so that such award would not become "token amounts."" *Id*., citing H.R. Rep. No. 99-908 ("[t]he compensation set for death benefits and for maximum awards for pain and suffering under Section [15] (described above) are to be increased to account for inflation . . ."). According to petitioner, "the Committee clearly expected awards that fall *below the cap* to be adjusted over time to account for inflation." *Id*. at 7 (emphasis in original).

Petitioner further submits, "If the petitioner will endure some level of pain and suffering in the future, as Mr. Geller clearly will, the Special Master is obligated to make an award for future pain and suffering." Motion at 11.

However, petitioner did not cite to any other cases awarding pain and suffering damages for brachial neuritis or similar injuries in support of his demand, nor did he provide any explanation of why $225,000.00 is an appropriate award for past pain and suffering.

**B. Respondent's Argument**

Respondent proposes $120,000.00 in actual pain and suffering damages. Response at 1.

Respondent provides little analysis of the facts of the instant matter, but an extensive discussion of the history of the Vaccine Act and the legislative intent involved in determining the $250,000 statutory cap. Respondent submitted that the $250,000 limit was set with the consideration that petitioners would be compensated for "devastating" injuries, such as paralysis, encephalopathy, anaphylactic shock, and residual seizure disorder. Response at 10, citing Staff of H. Sub. Comm. On Health and the Environment, 99th Cong., Rep. on Childhood Immunizations 22 (Comm. Print. 1986) (House Subcommittee noting that "[e]xamples of adverse reactions include encephalomyelitis . . . and paralytic poliomyelitis").

Respondent agreed that the value of $250,000 was "much more in the 1980's than today" but submitted that "the "fix" for any perceived inadequacy of the statutory cap is for Congress to raise the amount by statute, rather than an arbitrary shift in the administration of the Vaccine Program." Response at 11 n.3.

Regarding the instant matter, respondent submitted that, in making his proffer of $120,000, he "considered petitioner's acute presentation and his ongoing sequelae of diminished fine motor skills in his left hand, as well as respondent's own experience and review of damages in factually similar cases." Response at 16. Respondent pointed out that, "within approximately

7

five weeks of his vaccination," petitioner reported an 85% reduction in pain, and as of July 2016, less than ten months post-vaccination, petitioner's treater deemed his hand "mostly recovered" aside from difficulties with fine motor tasks." *Id*. at 15, citing Pet. Ex. 2 at 107, 157. Respondent did not cite to any other cases awarding pain and suffering damages for brachial neuritis or similar injuries in support of his proffer.

### IV. Legal Standard for Damages

Compensation awarded via the Vaccine Act shall include "actual and projected pain and suffering and emotional distress from the vaccine-related injury…not to exceed $250,000." § 15(a)(4). The petitioner bears the burden of proof for each of element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

Pain and suffering and emotional damages are "inherently subjective" and cannot be calculated mathematically. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013). In determining an award of pain and suffering, special masters should consider the awareness of the injury, severity of the injury, and duration of the suffering. *Id.*; *McAllister v. Sec'y of Health & Human Servs.*, No. 91-1037V, 1993 WL 777030, at *3 (Fed Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds,* 70 F.3d 1240 (Fed. Cir. 1995).

In the past, special masters determined pain and suffering on a continuum, where only the most severely injured received the full $250,000 amount available for pain and suffering. *See, e.g.*, *Hocraffer v. Sec'y of Health & Human Servs.*, No. 99-533V, 2007 WL 914914, at *5-6 (Fed. Cl. Spec. Mstr. Feb. 28, 2007) (discussing the development of the "continuum of injury" for awards of pain and suffering). This approach was explicitly rejected by the Court of Federal Claims in 2013. In *Graves v. Sec'y of Health & Human Servs*., Judge Merow stated that this approach forced "all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." 109 Fed. Cl. 579, 589-90 (2013). Instead, pain and suffering damages should be assessed independently of the $250,000 statutory limit, after which the cap is "applied." *Id*. at 587-88. Judge Merow determined the appropriate award of pain and suffering damages using the three *McAllister* factors and looking to prior pain and suffering awards made in both Vaccine Program cases and comparable injury cases outside of the Vaccine Program. *Id*. at *589-91. Similarly, a special master may look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering. *Jane Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case.").

### V. Analysis

**A. Determining Petitioner's Award in this Case**

    **1. Awareness of Injury**

8

Neither party has raised any issue concerning petitioner's awareness of suffering in this matter, and this issue is not in dispute. Thus, I find that petitioner had full awareness of his suffering.

### 2. Severity of the Injury

While petitioner's affidavit filed November 24, 2017 states that his pain began two days after his vaccine was administered on September 22, 2015, the contemporaneous medical records indicate that petitioner experienced an onset of pain two days prior to his presentation to Dr. Spiegel on October 7, 2015. Pet. Ex. 7 at ¶ 2; Pet. Ex. 2 at 111. Thus, based on the medical records, it appears that petitioner suffered from severe pain beginning on or about October 5, 2015, two days prior to his October 7, 2015 presentation to Dr. Spiegel, and approximately two weeks after receipt of the flu vaccine on September 22, 2015. Pet. Ex. 2 at 111.

Although petitioner stated in his affidavit that he suffered "exquisite" pain for the first year of his injury, this claim is not supported by the contemporaneous medical records. Pet. Ex. 11 at ¶ 1. Medical records support that he suffered severe pain for about two weeks, which then lessened to mild to moderate pain. By October 21, 2015, petitioner reported an 85% reduction in pain as a result of the higher steroid dose prescribed at his previous visit to Dr. Spiegel on October 15, 2021. *See* Pet. Ex. 7 at ¶¶ 2-3; Pet. Ex. 2 at 107-12. Petitioner was also able to return to work at this time. Pet. Ex. 2 at 107.

During a visit with Dr. Spiegel on November 11, 2015, petitioner reported that he was still experiencing "residual pain and weakness" after weaning off the steroids entirely. Pet. Ex. 2 at 105. He then attended a total of five PT sessions ending in December 2015; on the day that he began PT approximately eight weeks post-vaccination, he reported weakness in his left hand but rated his pain at a one to two out of ten with the use of Tylenol and/or Motrin. Pet. Ex. 3 at 1-6; Pet. Ex. 2 at 105. Around the time he started PT in November 2015, petitioner was prescribed gabapentin for his neuropathic pain. Pet. Ex. 5 at 3.

In February 2016, five months post-vaccination, petitioner could pick up and carry his briefcase and was able to type, though he still had trouble with fine motor tasks. Pet. Ex. 5 at 4. By ten months post-vaccination in July 2016, Dr. Spiegel reported that petitioner was "mostly recovered, still with difficulties with fine motor tasks." Pet. Ex. 2 at 102.

In March 2017, petitioner's left-hand weakness was noted as "remain[ing] stable with no improvement or worsening of function." Pet. Ex. 2 at 74. Petitioner presented to his cardiologist on April 17, 2017 for a follow-up visit. Pet. Ex. 4 at 3. Petitioner was noted as "feeling well. The neurologic issue does not limit him in any way." *Id*. He reported exercise including "running, biking and skiing" and that "overall he is feeling very well."

By May 2017, petitioner gained enough strength to button the top button of a shirt and use nail clippers by forming a fist. Pet. Ex. 7 at ¶ 5. In the summer 2017, he was able to hold the main sheet of a sailboat. *Id*.

In his letter dated October 24, 2019, Dr. Hoke opined that petitioner has "had mostly a good recovery but has residual left-hand weakness" that is "a permanent weakness at this point," stating that he "do[es] not expect him to recover any further." Pet. Ex. 10 at 1. As of January 2020, petitioner still had some difficulty with fine motor control: he cannot use a pipette or perform certain experiments at work, open a jar lid or bottle cap, pick vegetables or weeds with his left hand, and has occasional difficulty using utensils. *Id*.; Pet. Ex. 11 at ¶¶ 3-5.

Notably, however, in addition to his left shoulder brachial neuritis, petitioner had other sources contributing to his pain and suffering, including cervical spine stenosis and degenerative disc disease prior to vaccination. Pet. Ex. 2 at 155-56. He also had prior left shoulder issues. In 2012, petitioner saw Dr. Spiegel for left shoulder pain, and reported left shoulder pain again during a visit for left knee pain in 2013. Pet. Ex. 2 at 13, 37. He was noted to have "significant" entrapments neuropathies at the median and ulnar nerves in his lower arm which were unrelated to his brachial neuritis." Pet. Ex. 5 at 2, 4. He also had ongoing problems with his right hip and thigh which affected his running.

### 3. Duration of Suffering

Following the onset of his left shoulder pain on approximately October 5, 2015, petitioner suffered from severe pain for about two weeks, until October 21, 2015, when he reported an 85% reduction in pain but continued weakness of the left hand. Pet. Ex. 2 at 107, 111. *Id*. Petitioner then continued to experience mild to moderate pain for approximately three weeks; by the time he presented to Dr. Spiegel on November 11, 2015, he rated his pain at a one to two out of ten with daily use of Tylenol and Motrin. Pet. Ex. 2 at 105. At his November 12, 2015 visit with Dr. Hoke, petitioner reported his pain had improved slowly after the initial pain, but his weakness was "persistent." Pet. Ex. 5 at 1.

While left shoulder pain was not noted in his medical records after November 12, 2015, Dr. Geller continued to experience left hand weakness. On March 31, 2017, his left-hand weakness was noted by Dr. Spiegel as "stable with no improvement or worsening of function." Pet. Ex. 2 at 74. In his October 24, 2019 letter, Dr. Hoke wrote that petitioner has "had mostly a good recovery but has residual left-hand weakness" that is "a permanent weakness at this point," and he "do[es] not expect him to recover any further." Pet. Ex. 10 at 1. In petitioner's supplemental affidavit filed in January 2020, he noted that his left-hand weakness "initially caused a severe loss of function" that has "improved over the intervening years," but he still has "substantial deficits" that have "significantly impeded certain activities that were possible before the injury." Pet. Ex. 11 ¶ 1, 3. Additionally, his supplemental affidavit states that he "occasionally experience[s] pain in the affected areas." *Id*. at ¶ 4. However, Dr. Geller's records do not indicate that he required further treatment for his pain.

### B. Comparison to SIRVA Awards

Due to the lack of reasoned decisions awarding damages in brachial neuritis cases, I have turned to damages decisions on shoulder injury related to vaccine administration ("SIRVA") claims for guidance in evaluating the instant claim. Because brachial neuritis and SIRVAs are similar in anatomical scope and often have similar impacts on daily life, SIRVA cases are a

10

reasonable albeit imperfect comparison point for cases involving brachial neuritis. However, the decisions discussed are only a small subset of reasoned SIRVA decisions.

### 1. Cases Involving Permanent Injuries

#### i. Rafferty

Ms. Rafferty, the mother of twin three-year-old sons, sustained a SIRVA after receiving a flu vaccine; she was awarded $127,500.00 in past pain and suffering but was not found to be entitled to compensation for future pain and suffering. *Rafferty v. Sec'y of Health & Human Servs.*, No. 17-1906V, 2020 WL 3495956, at *1 (Fed. Cl. Spec. Mstr. May 21, 2020). Ms. Rafferty had a history of chronic back and hip pain and leg weakness associated with several surgeries after a fall, but she did not have a history of arm or shoulder pain prior to vaccination. *Id*. at *2. She was diagnosed with a partial tendon tear, mild tendinosis, and mild osteoarthritis and was prescribed prednisone. *Id*. at *3. Ms. Rafferty attended nine physical therapy sessions before undergoing arthroscopic surgery, including a bursectomy and debridement. *Id*. at *4-5. She then attended 24 physical therapy sessions as part of her post-surgery rehabilitation. *Id*. at *6. Ms. Rafferty recovered well; although she had some residual aching due to scar tissue, she had no permanent loss of function in the affected arm. *Id*. at *7.

The special master determined that Ms. Rafferty suffered moderate to severe pain during the five-month period between her receipt of the vaccine and her surgery; after surgery, Ms. Rafferty experienced gradual improvement until September 2017, nearly one year post-vaccination, at which time she had minimal pain and suffering. *Id*. at *15-16. The special master further determined that Ms. Rafferty was not entitled to compensation for future pain and suffering. Although Ms. Rafferty claimed that she suffered ongoing pain, there was no evidence in the record to support that she took or required medication or other treatment for her discomfort, and her treating physician opined that further treatment was not warranted. *Id*. at *18.

#### ii. Drake

Ms. Drake sustained a SIRVA after receiving a flu vaccine and was awarded $125,000.00 in pain and suffering damages. *Drake v. Sec'y of Health & Human Servs.*, No. 18-1747V, 2020 WL 4674105, at *1 (Fed. Cl. Spec. Mstr. July 7, 2020). She was diagnosed with adhesive capsulitis, bursitis, and impingement syndrome. *Id*. at *2. Ms. Drake received a steroid injection and completed ten sessions of physical therapy; during this time, she rated her pain levels between a four and a six out of ten. *Id*. Seven months after receipt of the flu vaccine, Ms. Drake underwent arthroscopic surgery with extensive debridement. *Id*. Following surgery, she attended 19 physical therapy sessions over three months. *Id*. Upon discharge from physical therapy, Ms. Drake had intermittent pain and a 39% shoulder disability, which caused her difficulty with daily activities, including lifting, carrying, and driving. *Id*. The special master found that Ms. Drake suffered moderate pain for 10 months.

#### iii. Leslie

11

Dr. Leslie, a radiologist, sustained a SIRVA after receiving a flu vaccine and was awarded $125,000.00 in pain and suffering damages. *Leslie v. Sec'y of Health & Human Servs.*, No. 18-39V, 2021 WL 837139, at *1 (Fed. Cl. Spec. Mstr. Jan. 28, 2021). Dr. Leslie had immediate pain and difficulty using the affected arm for three to four weeks following his vaccination. *Id*. at *2. He saw an orthopedist, who ordered an MRI and diagnosed Dr. Leslie with a SIRVA. *Id*. Dr. Leslie engaged in a home stretching program and had 40 percent improvement but continued pain at a level of two to seven out of ten. *Id*. at *3. A few months later, Dr. Leslie sought a second opinion. *Id*. at *2. He reported a pain level of two to four out of ten. *Id*. He was diagnosed with SIRVA and adhesive capsulitis. *Id*. A second MRI showed increased erosion at the humeral head. *Id*. at *3. Petitioner received a cortisone injection. *Id*. at *4. He then attended four PT sessions; upon discharge from PT, he had met all PT goals except one, which was assessed at being 90 percent met. *Id*. Petitioner later reported being pain free and was assessed as having returned to his functional baseline. *Id*. at *4-5.

The special master found that Dr. Leslie suffered moderate to severe pain and limited range of motion during the approximately nine months between his receipt of the vaccine and his receipt of the cortisone injection. *Id*. at *10. However, the special master characterized Dr. Leslie's overall SIRVA as mild, based on Dr. Leslie's return to functional baseline without the need for extensive PT or invasive surgery. *Id*. The special master further found that the stress and uncertainty related to Dr. Leslie's bone erosion merited a slightly larger award than petitioner might otherwise receive but did not agree that the award should extend to the magnitude petitioner requested, as there was no indication Dr. Leslie would need future treatment. *Id*.

The special master compared Dr. Leslie's claim to *Danielson v. Sec'y of Health & Human Servs.*, No. 18-1879V, 2020 WL 8271642 (Fed. Cl. Spec. Mstr. Dec. 29, 2020) and *Dawson-Savard v. Sec'y of Health & Human Servs.*, No. 17-1238V, 2020 WL 4719291 (Fed. Cl. Spec. Mstr. July 14, 2020). The special master found that the bone erosion suffered by Dr. Leslie was more severe than the bone bruise suffered by Danielson, and thus merited more compensation than the $110,000.00 awarded to Danielson. *Leslie*, 2021 WL 837139, at *11, citing *Danielson*, 2020 WL 8271642, at *1, 5, 7. In contrast, the petitioner in *Dawson-Savard* suffered significant pain for 24 months, required 13 cortisone injections, and was expected to have some permanent impairment. *Leslie*, 2021 WL 837139, at *11, citing *Dawson-Savard*, at 2020 WL 4719291, at *2-3. The special master found that Dr. Leslie should be awarded slightly less than Dawson-Savard, who received $130,000, as Dr. Leslie had a lesser degree of physical pain. *Leslie*, 2021 WL 837139, at *11.

### iiii. Dawson-Savard

Ms. Dawson-Savard sustained a SIRVA after receiving a flu vaccine; she was awarded $130,000.00 for actual pain and suffering and $500.00 per year for future pain and suffering. *Dawson-Savard v. Sec'y of Health & Human Servs.*, No. 17-1238V, 2020 WL 4719291 (Fed. Cl. Spec. Mstr. July 14, 2020). A physical examination approximately three and one-half months after vaccination revealed limited range of motion, and an orthopedist ordered an MRI which showed bursitis and mild degenerative changes. *Id*. at *2. In July 2017, petitioner was diagnosed with adhesive capsulitis. *Id*. at *3. Overall, from 2017 to 2019, petitioner received a combination of 13 steroid and trigger point injections and attended 35 physical therapy sessions. *Id*. During

12

this time, her pain was averaging a three out of ten. *Id*. In March 2019, Ms. Dawson-Savard's doctor reported that she had "permanent impairment" with "loss of range of motion at the left shoulder in all planes of movement." *Id*.

The special master characterized Ms. Dawson-Savard's injury as severe, particularly compared to other cases in which petitioner did not require surgery, due to her permanent impairment and loss of range of motion in her left shoulder. *Dawson-Savard*, 2020 WL 4719291, at *3. The special master compared the case to *Binette* and *Curri*, in which petitioners were awarded $1,000.00 and $550.00 per year in future pain and suffering, respectively, where both had significant pain and some permanent injury. *Id*. at *4.

### 2. Cases Involving Co-morbidities

#### i. <u>Fry</u>

Ms. Briggs, an 82-year-old woman, sustained a SIRVA after receiving a pneumococcal conjugate vaccine and was awarded $120,000.00 in pain and suffering. *Fry v. Sec'y of Health & Human Servs.*, 18-1091V, 2020 WL 8457671, at *1, 4 (Fed. Cl. Spec. Mstr. Dec. 16, 2020). At the time of her vaccination, she suffered from congestive heart failure, COPD, osteoarthritis in multiple joints, and kidney disease. *Id*. at *7. She had also had several debilitating falls. *Id*. An MRI showed severe glenohumeral osteoarthritis with degenerative tears, severe tendinopathy, and bursitis. *Id*. at *4. She attended eight physical therapy sessions and received two steroid injections. *Id*. at *6. A total shoulder arthroplasty was recommended, but Ms. Briggs was not a surgical candidate due her age and significant comorbidities. *Id*. at *6-7. She had severe pain which required the use of opioid pain medication. *Id*. at *7. Ms. Briggs died of unrelated causes approximately four years after she received the vaccine. *Id*.

The special master found that Ms. Briggs suffered from comorbidities that constituted other sources of pain. Fry, 2020 WL 8457671, at *7. The special master found Ms. Briggs's claim comparable to both *Dawson-Savard* and *Binette v. Sec'y of Health & Human Servs.*, No. 16-731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019), in which the petitioners did not have surgery but "suffered from their injuries for a length time with permanent impairment" and were each awarded $130,000.00 in pain and suffering. *Id*. at *7. Thus, the special master found that a slightly lower number was appropriate, considering Ms. Briggs's comorbidities, and awarded her $120,000.00 in pain and suffering. *Id*.

#### ii. <u>Kent</u>

Ms. Kent sustained a SIRVA after receiving a flu vaccine and was awarded $80,000.00 in pain and suffering. *Kent v. Sec'y of Health & Human Servs.*, No. 17-73V, 2019 WL 5579493, at *1 (Fed. Cl. Spec. Mstr. Aug. 7, 2019). An MRI performed approximately three months post-vaccination showed tendinosis and a tear in the supraspinatus tendon. *Id*. at *2. An orthopedic surgeon determined that the rotator cuff tear was present prior to vaccination and diagnosed Ms. Kent with adhesive capsulitis. *Id*. at *3. She attended 32 physical therapy sessions over five months. *Id*. at *5, 13 n.30.

The special master found that Ms. Kent suffered significant pain and profoundly limited range of motion for six months; at ten months post-vaccination, petitioner had some pain but no longer required medical care. *Kent*, 2019 WL 5579493, at *11. The special master found that Ms. Kent merited a slightly lower award due a rotator cuff tear present prior to her receipt of the vaccine.

### iii. Knauss

Mr. Knauss, a 72-year-old man, sustained a SIRVA after receiving a pneumococcal conjugate vaccine and was awarded $60,000.00 in pain and suffering. *Knauss v. Sec'y of Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906, at *1, 2 (Fed. Cl. Spec. Mstr. May 23, 2018). Prior to his vaccination, Mr. Knauss had complained of shoulder pain and was diagnosed with degenerative joint disease. *Id*. at *2. He reported shoulder pain three months after his vaccination and was referred to physical therapy. *Id*. After 14 PT sessions over two months, Mr. Knauss reported 75% improvement and a pain level of 1.5. *Id*. at *3. An MRI was ordered and showed tendinosis but no rotator cuff tear. *Id*. After three months of PT, Mr. Knauss reported 94% improvement and his pain level was 1.5 out of ten. *Id*. at *3, 7. After a six-month gap in treatment and approximately one-year post-vaccination, Mr. Knauss presented to a second orthopedist with complaints of arm pain and limited range of motion. *Id*. at *3-4. A second MRI showed tendinosis and some bursitis. *Id*. at *4. The orthopedist administered a steroid injection and recommended additional PT, which Mr. Knauss did not attend. *Id*.

The special master found it significant that Mr. Knauss "went extended periods of time without any treatment" which indicated that his pain "did not interfere with his. . . activities of daily life to a degree that was unmanageable." *Knauss*, 2018 WL 3432906, at *7. Although Mr. Knauss requested damages for future pain and suffering, the special master found that the evidence did not support Mr. Knauss's request, noting that Mr. Knauss was able to dress himself, sleep on his side, swim backstroke, volunteer, and travel. *Id*. at *8. The special master also noted that Mr. Knauss had a hand tremor which was not related to his vaccination. *Id*. at *4 n.7.

### 3. Comparison to Petitioner's Claim

Petitioner requests $225,000.00 in past pain and suffering and $5,000 per year in future pain and suffering for his remaining life expectancy. Motion at 11.

Each of the cases discussed above share some similarity with the instant case. Like the petitioner in *Leslie*, Dr. Geller experienced an onset of pain and difficulty using the affected arm for several weeks before seeing a significant reduction in pain, though Dr. Geller's reduction in pain was greater. While Dr. Leslie and Dr. Geller completed four and five physical therapy sessions, respectively, Dr. Leslie met almost all his physical therapy goals, but Dr. Geller did not demonstrate significant progress at the time of his discharge from physical therapy. Where Dr. Leslie returned to his functional baseline after physical therapy and one cortisone injection, Dr. Geller was assessed with permanent weakness.

Although petitioner did not require extensive therapy, surgery, or injections, his situation bears stronger similarities to *Kent*, *Drake*, and *Knauss* regarding his recovery. Like Ms. Kent,

who recovered well although she still had mild pain and some residual limitations of range of motion, Dr. Geller's recovery was described by his treating physician as "mostly good," even though he has residual, permanent left-hand weakness. Further, like Ms. Kent who had an existing rotator cuff tear at the time of vaccination, petitioner's records indicate that he sought treatment for left shoulder pain in 2012 and continued care for pain related to his diagnoses of cervical spine stenosis and degenerative disc disease.

Both Ms. Drake's and Dr. Geller's injuries caused them difficulty in completing daily tasks. Where Ms. Drake had difficulty with activities such as lifting, carrying, and driving, during the acute stage of his injury, Dr. Geller could not tie his shoelaces, button his clothing, turn doorknobs, or use a zipper with his left hand. He continues to struggle with activities at work that require fine motor control, and certain household activities, like opening a jar or weeding with his left hand. However, petitioner's condition is similar to the petitioner in *Knauss* in that there are many activities that he is still able to do. Like Mr. Knauss, who was able to dress himself, swim backstroke, volunteer, and travel, Dr. Geller can run, bike, ski, button the top button of a shirt, and hold the main sheet of a sailboat. Additionally, Dr. Geller was able to return to work approximately two weeks after onset of his injury.

Notably, Dr. Geller had several chronic conditions that caused pain in conjunction with his brachial neuritis. In *Fry*, the special master found that Ms. Briggs's claim was comparable to those in *Binette* and *Dawson-Savard*, where the petitioners did not have surgery but suffered from their injuries for a length time with permanent impairment and were each awarded $130,000.00 in pain and suffering. However, Ms. Brigg's award was slightly reduced due to her comorbidities that constituted other sources of pain and suffering.

Even though Dr. Geller did not undergo surgery and has been assessed by his treaters with permanent weakness, his situation is most like that of the petitioner in *Fry*, in that Dr. Geller had other sources of pain and suffering including existing diagnoses of cervical spine stenosis and degenerative disc disease at the time of his vaccination. During the treatment of his brachial neuritis, he was noted as having significant entrapment neuropathies at the left wrist for which he began using wrist braces and which were determined to be unrelated to his brachial neuritis. In the years following his injury, petitioner sought regular follow-up care for intermittent right hip and thigh pain as well.

With regard to future pain and suffering, petitioner's treating neurologist opined that he does not expect Dr. Geller to recover any further and the left-hand weakness is "a permanent weakness at this point." As set forth above, however, he also had unrelated significant entrapment neuropathies at the wrist requiring the use of wrist braces. Although Dr. Geller's recovery was characterized as mostly good by his treaters, his situation bears greater similarity to *Dawson-Savard* than it does to *Rafferty*, who was not found to be entitled to future permanent pain and suffering, because he is left with a permanent impairment.

## VI. Conclusion

For the reasons discussed above, and after considering the record, I find that $125,000.00 represents a fair and appropriate amount of compensation for petitioner's past pain and suffering,

15

and $2,500.00 per year, reduced to net present value, for the rest of his life expectancy for future pain and suffering. Dr. Geller's date of birth is February 20, 1945, and his remaining life expectancy is approximately 11 years.[3] Thus, his future pain and suffering damages total $27,500.00 prior to reduction to net present value.

However, at this time, neither party in this matter has proposed an appropriate net discount rate with which to address the award of future pain and suffering to net present value.

Accordingly, the following is hereby ORDERED:

**By no later than Monday, January 17, 2022,** the parties shall file a joint status report advising on an agreed upon net discount rate for my award of future pain and suffering to its net present value. If the parties are unable to agree on a net discount rate, the joint status report should advise on how they intend to proceed.

Once this issue has been resolved, a damages decision will issue.

**IT IS SO ORDERED.**

                                                   **s/Mindy Michaels Roth**
                                                   Mindy Michaels Roth
                                                   Special Master

---

[3] The Social Security Administration (SSA) calculates life expectancy. Their life expectancy calculator can be found at https://www.ssa.gov/OACT/population/longevity.html (last visited December 14, 2021). According to SSA's life expectancy calculator, Dr. Geller has an additional life expectancy of 10.6 years. He is expected to live to be 87.4 years old.